UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROOKE CATHERINE S.,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL, Commissioner of Social Security,[1]<br><br>Defendant. | Case No. 8:19-cv-00446-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

Plaintiff Brooke Catherine S. ("Plaintiff") applied for Titles II and XVI disability benefits in October 2015 alleging disability on August 16, 2015, due to various mental disorders. Administrative Record ("AR") 207-19, 248-58. On February 8, 2018, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE"). AR 33-75. On March 28, 2018, the ALJ issued an

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

1

unfavorable decision. AR 12-32. The ALJ found that Plaintiff suffered from the severe impairments of "cervical spine sprain/strain; lumbar spine/strain; major depressive disorder; panic disorder; post-traumatic stress disorder; obsessive compulsive disorder; and borderline personality disorder." AR 18. The ALJ concluded that despite these impairments, Plaintiff had a residual functional capacity ("RFC") to perform medium work with the following non-exertional limitations: "is limited to work involving simple repetitive tasks; and is limited to work involving no more than occasional contact with co-workers and the public." AR 21.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could not perform her past relevant work as a retail clerk or bank teller, but she could perform the jobs of packer (Dictionary of Occupational Titles ["DOT"] 920.587-018) and kitchen helper (DOT 318.687-010). AR 26. The ALJ concluded that Plaintiff was not disabled. AR 27.

## II.
## ISSUE PRESENTED

This appeal presents the sole issue of whether the ALJ gave specific and legitimate reasons for discounting the opinions of examining psychologist Dr. Helayna Taylor. (Dkt. 18, Joint Stipulation ["JS"] at 4.)

## III.
## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v.

Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the district court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

In deciding how to resolve conflicts between medical opinions, the ALJ must consider that there are three types of physicians who may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff. See Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is generally entitled to more weight than that of an examining physician, which is generally entitled to more weight than that of a non-examining physician. Id. If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. Id. The ALJ must give specific and legitimate reasons for rejecting a treating physician's opinion in favor of a non-treating physician's contradictory opinion or an examining physician's opinion in favor of a non-examining physician's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

Here, the opinion of Dr. H. Taylor was contradicted by the opinions of the state agency doctors (see AR 76-101), meaning that the dispositive question is whether the ALJ gave "specific, legitimate reasons" for discounting Dr. Taylor's opinions.

# IV.
# SUMMARY OF RELEVANT MEDICAL EVIDENCE

The administrative record generally contains the following evidence of Plaintiff's mental illness and the functional limitations it causes:

(1) Records from treating psychiatrist Dr. Weiming David Chu (AR 353-89, 397-430, 440-75, 696-742);

(2) Questionnaire completed by treating psychiatrist Terrance Taylor (AR 390-94);

(3) Handwritten notes from therapist Gail Benge (AR 647-95);

(4) December 2016 records from Hoag Hospital (AR 621-46);

(5) 2015 function reports by Plaintiff (AR 282-90) and her adoptive mother (AR 291-98);

(6) Psychiatric evaluation by Dr. Helayna Taylor (AR 486-93);

(7) 2010-2012 treatment records from Orange County Behavioral Health Services (AR 497-620); and

(8) Opinions by non-examining state agency consultants Drs. Tawnya Brode (AR 95-99) and Dan Funkenstein (AR 109-16).

## A. Dr. Chu's Records.

The following summary of Dr. Chu's records is presented in chronological order:

• 6/24/14: This was Plaintiff's first appointment with Dr. Chu. AR 384. A mental status examination ("MSE") revealed a "depressed" but "cooperative" mood with "fair" insight and judgment and no suicidal ideations. AR 385. Plaintiff's symptoms included "dysfunction in career, social interactions, family interactions, romantic relationships." Id. Plaintiff was already taking Effexor (the brand name for venlafaxine hydrochloride) and started Adderall. AR 386.

• 7/15/14: Plaintiff reported nausea since starting Adderall. She also reported that Adderall was helping her focus, and she needed to focus and do well

at her new bank job. Her mood was "sad, hopeless." AR 382.

- 7/17/14: Plaintiff continued to report nausea. She presented with a "depressed, sad" mood. AR 380.
- 9/3/14: Plaintiff reported "moderate improvement" of her symptoms, but she stopped taking Effexor to address her nausea. AR 378.
- 10/6/14: Plaintiff presented for medication management with a "happy mood," "good" judgment, and "stable" symptoms. AR 376. Dr. Chu noted that she was on Adderall, Effexor, and Acyclovir (an anti-viral drug unrelated to Plaintiff's mental illness). AR 377.
- 12/29/14: The MSE notes tearfulness, poor insight, and impaired impulse control. AR 374. Plaintiff was "unable to concentrate and follow through w/ tasks." Id. She was "not doing well" and "very depressed," so Dr. Chu increased Effexor and changed her Adderall dosage. AR 375.
- 1/26/15: The MSE again notes tearfulness, poor insight, and impaired impulse control. AR 372. Plaintiff was "not doing well" and "very anxious," so Dr. Chu started Propranolol. AR 373.
- 3/4/15: The MSE was unremarkable but for "fair to poor" insight and judgment. AR 370. Plaintiff reported a "slight improvement in mood" after increasing Effexor and changing her Adderall dosage. Id.
- 4/7/15: The MSE was back to noting tearfulness, poor insight, and impaired impulse control. AR 368. Plaintiff was "not doing well," so Dr. Chu started Lamictal. AR 369.
- 7/7/15: The MSE again notes tearfulness, poor insight, and impaired impulse control. AR 366. She was still "not doing well," so Dr. Chu increased Lamictal. AR 367.
- 8/25/15: Same MSE. AR 364. Plaintiff was "not doing well," so Dr. Chu increased Pristiq. AR 365.
- 9/29/15: The MSE again notes tearfulness, poor insight, and impaired

impulse control.  AR 362.  She was still "not doing well," so Dr. Chu started Seroquel.  AR 363.

- 10/20/15: Same MSE.  AR 360.  Dr. Chu's impression was "pt is not doing well"; Plaintiff was instructed to follow up in two months with no medication changes.  AR 361.
- 11/17/15: Plaintiff had a "moderate response" to current medications and an unremarkable MSE.  AR 358-59.
- 12/14/15: The MSE returned to noting tearfulness, poor insight, and impaired impulse control.  AR 402.  Dr. Chu assessed that Plaintiff was "not doing well," so he considered increasing Cytomel.  AR 403.  He also assigned a GAF [global assessment of functioning] score of 50.[2]  Id.
- 1/11/16:  Plaintiff reported being very anxious and depressed.  AR 442.  The MSE continued to note judgment and insight "poor" but cognitive abilities average.  Id.  Because Plaintiff was "not doing well," Dr. Chu adjusted her medications.  AR 443.
- 3/21/16:  Plaintiff reported that she was unable to hold a job because of anxiety.  AR 440.  Dr. Chu assessed that she was "not doing well," so he made "some med changes."  AR 441.
- 5/31/16:  Dr. Chu assessed that she was "not doing well," so he increased her dosage of Abilify.  AR 701.
- 7/29/16:  Plaintiff reported doing "okay" without a depressed mood but

---

[2] A GAF of 41 to 50 means "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  A GAF of 51-60 means "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)."  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

having problems with energy. AR 703. Dr. Chu again assessed that she was "not doing well," so he again increased her dosage of Abilify. AR 704.

- • 8/30/16: Plaintiff reported doing "better." Dr. Chu did not change her medications, because she was "more stable." AR 708.
- • 11/1/16: Plaintiff reported a depressed mood and requested changes to her medications. AR 710. Dr. Chu agreed she was "not doing well," so he discontinued Ability and started Latuda. AR 711.
- • 12/13/16: Plaintiff reported increased depression and suicidal ideations prompting her to go the emergency room. AR 713. Dr. Chu adjusted her medications. AR 714.
- • 1/17/17: Plaintiff reported feeling depressed and anxious and gaining weight. Dr. Chu again adjusted her medications because she was not "doing well." AR 717.
- • 2/14/17: Plaintiff reported feeling sad and having low energy most of the time. AR 719. Dr. Chu adjusted her medications because she was not "doing well." AR 720.
- • 5/2/17: Plaintiff reported that her depression was better. AR 722.
- • 6/26/17: Plaintiff reported that she was feeling tired with low energy because she had recently lost a friend. AR 725. Dr. Chu assessed her as "not doing well" and "still depressed and anxious." AR 726. He increased her Rexulti. Id.
- • 8/21/17: Plaintiff reported feeling very tired and overwhelmed. AR 727. She had a GAF score of 50, which Dr. Chu characterized as her highest. AR 728. She was instructed to follow up in three months. AR 729.
- • 9/25/17: Plaintiff reported going to jury duty and being unable to tolerate being in public and following direction. Dr. Chu generally assessed no changes since Plaintiff's last visit but reduced her GAF score to 40. AR 731-32. He listed her 12 then-current medications. AR 733.

7

     • 10/23/17: Plaintiff continued to be "very depressed," and Dr. Chu assessed no change. AR 735. He instructed her to follow-up in one month with no changes to her medication. AR 738.

     • 11/20/17: Plaintiff reported feeling tired, tearful, and depressed. AR 739. Dr. Chu made multiple adjustments to her medications. AR 742.

### B. Dr. Terrance Taylor's Questionnaire.

Dr. T. Taylor completed a mental disorder questionnaire after examining Plaintiff in October and November of 2015. AR 394. His prognosis was that Plaintiff suffers from "severe and persistent mental illness." Id. Dr. Taylor gave lengthy, detailed answers to the form's questions. In terms of functional opinions, he observed that she had difficulty arriving on time to appointments, retaining information, and following instructions. AR 391. She presented as "anxious and depressed" with suicidal thoughts. AR 392. She engaged in obsessive compulsive behavior, such as hoarding and cleaning. AR 391-92. Regarding social interactions, Dr. Taylor noted that Plaintiff's hoarding and lack of energy caused conflict with her family and roommates. AR 393. He recorded her reports that she had lost multiple jobs because she would call in sick or show up late due to depression, fatigue, or self-isolation. AR 393.

### C. Therapist Gail Benge's Records.

These therapy notes span from September 2015 (AR 695) to February 2017 (AR 647). The notes generally discuss Plaintiff's conflict with her adoptive mother; Plaintiff felt pressured, criticized, and misunderstood when her mother imposed requirements and called her "lazy." See, e.g., AR 652, 658, 660, 674, 685. At various times, Ms. Benge assessed Plaintiff's depression on a scale of 1-10. See AR 694 (7 on 9/29/15), AR 685 (8 on 1/19/16), AR 679 (7 on 6/2/16), AR 677 (5 on 7/15/16), AR 667 (6 on 10/20/16), AR 663 (10 on 12/1/16; Ms. Benge discussed 5150 [the "danger to self or others" code section] with Plaintiff and called Plaintiff's mother to drive her to the hospital), AR 662 (6 on 12/20/16). Ms.

Benge discussed Plaintiff's hoarding (AR 674, 685), difficulty making friends (AR 649), and difficulty getting up in the morning (AR 667).

Ms. Benge also discussed Plaintiff's history of verbal and emotional abuse by her stepfather (who, for example, put a cigarette out on her dog's mouth when she was a child to be "funny," AR 691) and dysfunctional relationship with her boyfriend, Tyler. See AR 695 (identifying Tyler as boyfriend); AR 691 (Tyler moved into her mother's house with her while mother out of town and embarrassed her at a Halloween party for friends); AR 687 (Tyler asked someone else to be his girlfriend); AR 686 (Plaintiff considered taking Tyler back despite friends' reports of his drug use); AR 674 (they "discussed reasons for staying with Tyler who is constantly critical, jealous, and controlling"); AR 660 (Plaintiff feared losing Tyler because she had "no one else"); AR 651 (Tyler caused stress by talking only about his problems; "he is now wanting to be a girl and is taking hormones" because he believes "things are easier for girls"); AR 647 (Tyler accused Plaintiff of not loving him when she refused to give him her Adderall); id. (Plaintiff "blocked Tyler on her phone" and therapist "congratulated her on good decision").

In January 2015, Plaintiff reported that she overdrank "once a week or more." AR 693. In October 2015, she reported having spent "a very hard 3 months" in rehab.³ AR 692. She was trying hard to stop drinking, because she recognized that drinking made her "unproductive." Id. In April 2017, Plaintiff reported smoking pot in the afternoons. AR 658.

Regarding her activities, in 2015, Plaintiff was selling cosmetics on Craigslist. AR 693. She did make-up for a photoshoot. AR 669. She took spin classes and jewelry classes, but she sometimes missed class because she could not get herself out of bed. AR 667, 665, 680-82. She lamented having no friends in

---

³ Compare, in January and October 2015, Plaintiff told Dr. Chu that she drinks socially. AR 360, 372.

9

her classes. AR 649. She wanted to work but feared that she could not. AR 662, 671. She often came late to therapy sessions. AR 647, 654, 662, 667.

### D. Hoag Hospital Records.

On December 1, 2016, Plaintiff told the emergency room staff that she did not feel like existing anymore, and they assessed her as a suicide risk. AR 623 (stating "*Verbalized Suicidal Ideations"). She reported sleeping most of the day and binging on junk food. AR 624. She was monitored until the next day. AR 629. On December 2, 2016, she was cleared to go home with her mother. AR 630.

### E. Function Reports.

In November 2015, Plaintiff identified herself as homeless. AR 282. She was able to drive and go to the store weekly. AR 285. She reported isolating herself and having trouble getting along with others. AR 287. She reported being fired from jobs due to personality conflicts and feeling easily overwhelmed. AR 288.

Plaintiff's mother reported that she would sleep all day or not at all, but she had no problems performing basic self-care. AR 292. She was able to use food stamps. AR 294. Plaintiff was interested in movies and crafts, but she had difficulty starting and finishing tasks. AR 295. Her mother concluded, "I have watched [Plaintiff] lose 27 jobs in 10 years and more living situations than that. She cannot function in the work world …. Her depression can be so deep that … she can become suicidal. [She] has an almost impossible ability to not make decisions, get some place on time, [and] conform …." AR 298.

### F. Records from Orange County Behavioral Health Services.

These records pre-date the period of claimed disability. Generally, they show that in 2010 and 2011, Plaintiff received treatment for major depression and cannabis abuse. AR 498. She spent two months in the hospital trying to regain sobriety and was homeless. AR 529. They also confirm her reports of obtaining multiple jobs (despite a prior petty theft conviction) but being unable to maintain

employment due to conflicts with supervisors. AR 500, 545, 572, 583.

G. **Non-Examining Opinions.**

In December 2015, Dr. Brode found that Plaintiff had sufficient cognitive abilities to carry out complex instructions, could "maintain concentration and attention over extended periods for semi-skilled tasks," "sustain appropriate interactions with the public and maintain relationships with coworkers and supervisors," and respond appropriately " to most changes in the work setting." AR 99. She also found that Plaintiff's ability to sustain an ordinary routine and maintain regular attendance was not significantly limited. AR 98. She opined that Plaintiff had only "mild" difficulties maintaining social functioning and "moderate" difficulty maintaining concentration or pace. AR 95.

In March 2016, Dr. Funkenstein agreed with Dr. Brode's assessment. AR 110.

H. **Dr. Helayna Taylor's Opinions.**

On September 4, 2015, Plaintiff underwent a psychological examination by Dr. H. Taylor, Ph.D. AR 486-93. Plaintiff was referred for the examination by her sister who accompanied her. AR 486. Her sister helped to provide medical history and records, including a letter from Dr. Chu stating that Plaintiff had been under his care since December 2014 and could not maintain employment due to depression and anxiety.[4] AR 486.

Plaintiff presented to Dr. Taylor with complaints of depression and anxiety. Id. Dr. Taylor noted that Plaintiff's then-current medications included Lamotrigine (an anti-convulsant used to treat seizures and bi-polar disorder), Propranolol (a beta-blocker used to treat high blood pressure and migraine headaches), and Liothyronine (a thyroid medication). Id. Dr. Taylor interviewed Plaintiff concerning her social and developmental history as well as her psychiatric history.

---

[4] The Court did not locate a copy of that letter in the AR.

AR 487. Dr. Taylor noted that Plaintiff was adopted by her great-aunt at age six months after residing in a court-ordered foster care home for drug-affected babies. Id. Dr. Taylor noted that Plaintiff began taking psychiatric medication at age 13 and has been in psychotherapy and on psychiatric medication ever since. Id.

Dr. Taylor also recorded Plaintiff's family psychiatric history, including multiple biological relatives who were diagnosed with mental illness and committed or attempted suicide. AR 488. Plaintiff told Dr. Taylor that she attended a 60-day rehab program in 2009 for alcohol and marijuana, but Dr. Taylor's report contains no discussion of ongoing alcohol use. Id. Her employment history was notable for 27 jobs since age 18 and the fact that she lost many of them due to missing work when she became depressed. AR 489.

Dr. Taylor administered several psychological tests. On the Beck Depression Inventory, Plaintiff scored 55, indicating the "upper level of the severe range" of clinical depression. AR 491. Her score also indicated a "very extreme concern with suicidal potential." Id. On the Beck Anxiety Inventory, Plaintiff scored 44, indicating "a very severe anxious state." Id.

Based on the interview, history, and psychological testing, Dr. Taylor diagnosed the following: Axis I: Major depressive disorder, recurrent, severe; Panic disorder, without agoraphobia; PTSD [post-traumatic stress disorder]; Poly-substance dependence in remission; obsessive compulsive disorder; and Eating disorder, NOS (not otherwise specified); Axis II: Borderline personality disorder; and Axis V: GAF of 45. AR 491-92.

Dr. Taylor also provided a medical source statement with opinions about Plaintiff's functional limitations. Dr. Taylor opined that Plaintiff was moderately limited in the ability to follow simple instructions; maintain adequate pace or persistence to perform one or two step simple repetitive tasks; and ability to maintain adequate attention/concentration. AR 492. Dr. Taylor opined that Plaintiff was markedly impaired in the ability to follow complex instructions; adapt

to changes in job routine; withstand stress of a routine workday; interact with co-workers, supervisors, and public; and adapt to changes, hazards, or stressors in workplace setting. Id. She summarized Plaintiff's emotional impairment as "markedly impaired." AR 492.

Dr. Taylor's report does not define the term "marked." The Court understands Dr. Taylor to have used it in a manner consistent with social security disability regulations, which define a "marked" limitation as one that is "more that moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."[5] 20 C.F.R. § 404, Subpt. P, App. 1. 12.00(C) (the Listings for adult mental disorders). Thus, Dr. Taylor opined that as to following complex instructions, interacting with others, withstanding the stress of a work routine, and adapting to normal stressors, Plaintiff's mental illness caused a degree of limitation that seriously interfered with Plaintiff's ability to function independently, appropriately, effectively, and on a sustained basis.

Dr. Taylor summed up her conclusions as follows:

> [Plaintiff] has several psychiatric disorders that clearly impair her functioning in regards to employment, and interpersonal relations. She is unable to maintain employment because of the severity of her depression and connected dysfunctional behaviors. She is not able to

---

[5] These regulations do not define moderate. Courts have accepted that a "moderate" limitation means, "[t]here is more than a slight limitation in this area, but the individual can still function satisfactorily." Cantu v. Colvin, 2015 U.S. Dist. LEXIS 29367, at *45 (N.D. Cal. Mar. 10, 2015) (citing Office of Disability Adjudication and Review, Social Security Administration, Form HA-1152-U3, Medical Source Statement of Ability to Do Work-Related Activities (Mental)).

13

> function in competitive employment. In addition, her disorders have
> resulted in deterioration of her relationships to a point where she is
> asked to leave the residence. This appears to occur with both
> roommate situations and when living with relatives. Although
> passive much of the time, she is known to also be argumentative and
> aggressive to a point where her adoptive mother suffered a TIA
> [transient ischemic attack] related to the stressors in her home.
>
> It is important to note the extensive psychiatric history of her
> family, and that there were several successful suicides made, and a
> serious attempt by another family member. This puts [Plaintiff] more
> at risk, as suicidal behaviors run within families. She admits to
> serious suicidal ideation and is at risk of it. Her medical providers
> need to monitor her for current risk and possibly initiate psychiatric
> hospitalization, if it should become imminent.

AR 492-493.

Dr. Taylor suggested more frequent therapy, partial hospitalization or a day treatment program, re-evaluation of her medications, and enrollment in a group sober living home. AR 493.

## IV.
## DISCUSSION

### I. The ALJ's Treatment of the Medical Evidence.

The ALJ gave partial weight to the opinions of the state agency physicians, finding that their opinions overstated Plaintiff's abilities. AR 23. The ALJ also gave partial weight to Dr. T. Taylor's opinions, finding them "vague" because they were not expressed in terms typically used to state RFCs. Id. The ALJ gave "little weight" to the GAF scores assessed by Plaintiff's treating sources, finding them only a "snapshot" and therefore less probative of Plaintiff's conditions than the "objective details" in her treating records over time. AR 24.

The ALJ gave little weight to Dr. H. Taylor's examining opinion for the following three reasons:

> [L]ittle weight is given to the opinion of Helayna Taylor, Ph.D., who opined in September 2015 mostly marked impairments in the various areas of mental work-related abilities (Exhibit 7F, p. 18 [AR 492]). As a whole, these stated limitations are overly restrictive in light of **[1]** the relatively routine mental health treatment received by the claimant and **[2]** the relatively controlled and stable mental symptoms discussed above. **[3]** These limitations are also not consistent with the paragraph B analysis.

AR 24.

### 1. Reason One: Routine Treatment.

Medical opinions that a claimant suffers from marked functional limitations may be discounted if they are inconsistent with the claimant's treatment records which show more limited or conservative treatment than one would expect a person with marked limitations to have received. See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (finding it proper for an ALJ to reject a physician's opinion that is inconsistent with the treatment record); see also Winslow v. Berryhill, No. CV 16-07309-KES, 2017 WL 5564522, at *10 (C.D. Cal. Nov. 17, 2017) (accepting as specific and legitimate ALJ's reasoning where ALJ pointed out that failure to recommend psychiatric hospitalization was inconsistent with the opinions of a doctor who found the claimant had marked limitations in functional areas).

In support of this reason, the ALJ characterized Plaintiff's treatment as "primarily … medications and outpatient visits." AR 22. "Aside from emergency care in December 2016 for depression-related symptoms, the claimant's treatment has primarily consisted of routine, non-emergency outpatient visits, psychotherapy, and psychiatric medications." AR 22.

Regarding the hospitalization in December 2016, Therapist Benge's notes explain that Plaintiff told her at a therapy session that she was having suicidal ideations; Plaintiff had attempted to call her doctor, but he was unavailable. AR 663. Ms. Benge suggested Plaintiff go to the hospital, but Plaintiff "did not want to go." Id. Plaintiff was willing to call her mother, and Ms. Benge advised her to pick up Plaintiff and take her to the hospital. Id. Plaintiff was "resistant" but agreed to go when they "discussed 5150 and its implication." Id. In other words, Ms. Benge was prepared to declare Plaintiff a danger to herself and subject her to involuntary hospitalization if Plaintiff did not agree to go. Ms. Benge wrote, "It was obvious to me that her depression had become much deeper than last week and that her demeanor had changed greatly." Id. Upon arriving at the hospital, Plaintiff verbalized suicidal ideation to the staff and was assessed as a suicide risk. AR 623.

Regarding additional hospitalizations, Dr. H. Taylor recommended partial hospitalization or a day treatment program. AR 493. It is unclear whether Plaintiff pursued such treatment, and if not, why not.

Regarding medications, Plaintiff has spent years on multiple anti-depressant and anti-psychotic medications. Many have serious side effects, such as nausea or drowsiness. AR 382 (she vomited twice her first day at a new job); AR 385 (Plaintiff reported "extreme fatigue"); AR 390 (Plaintiff reported "difficulty getting out of bed to get herself going"); AR 664 (Plaintiff's mother wants her to get out of bed by 8:30 a.m. rather than 10:00 a.m.).

There are not many more aggressive ways to treat mental illness than prescribing multiple strong medications, coupled with frequent therapy. Plaintiff was hospitalized once during her period of claimed disability, and an examining doctor recommended further hospitalization or outpatient day treatment. Overall, Plaintiff's treatment does not appear so conservative as to be inconsistent with Dr. H. Taylor's opinions of "marked" limitations.

## 2. Reason Two: Controlled and Stable Symptoms.

Regarding Plaintiff's symptoms, the ALJ stated, "the medical evidence of record does not reveal a significant increase in her mental or physical symptoms during the relevant period." AR 22. The ALJ characterized her symptoms as "stable and controlled" with treatment. AR 23. Per the ALJ, Plaintiff's "treating providers and evaluators mostly noted normal findings," citing Exhibits 4F, 6F, and 10F, all records from Dr. Chu. AR 22. The ALJ noted that MSEs showed that Plaintiff was generally oriented and had normal speech, cooperative behavior, fair judgment, and linear thinking. AR 23.

The record does not support the ALJ's findings. Plaintiff's treatment records show that her symptoms were fluctuating, not stable. See, e.g., AR 703-11 (Plaintiff went from "not doing well" to doing "better" and "more stable" back to "not doing well" within a period of about four months); AR 728-32 (Dr. Chu reduced her GAF score from 50 to 40 over the course of one month); AR 663 (therapist had her hospitalized for expressing suicidal ideation). Ms. Benge's assessment of Plaintiff's depression on a scale of 1-10 varied between 5 and 10. AR 677, 663. Dr. Chu adjusted Plaintiff's medications at nearly every appointment, presumably to try to address and improve Plaintiff's changing symptoms.

Plaintiff's treatment records do not contain "mostly noted normal findings." Again, Ms. Benge consistently assessed Plaintiff's depression at levels that are not "normal." AR 694, 685, 679, 677, 667, 663. Dr. T. Taylor reported severe and persistent depression, hoarding, and chronic conflict with others, not "normal" findings. AR 391-93. Dr. Chu mostly assessed Plaintiff as not doing well. AR 375, 373, 369, 367, 365, 363, 360, 403, 443, 441, 701, 704, 711, 717, 720, 726. He assessed GAF scores of 40 and 50 (AR 403, 728, 731-32), scores that denote impaired (not "normal") functioning and line up with Dr. H. Taylor's assessed GAF score of 45 (AR 492). Dr. Chu's MSEs do reflect that Plaintiff was alert and

17

oriented to person, place, time, and situation, did not experience hallucinations, displayed "normal" speech patterns, and behaved cooperatively during medical appointments. See, e.g., AR 384-85, 374-75, 372-73. This does not mean that the MSEs "mostly noted normal findings," however, because they also noted blunted affect, depressed mood, impaired impulse control, and tearfulness. Id. Most of Dr. Chu's MSEs assessed Plaintiff with "poor" judgment and impulse control, not "fair." See, e.g., AR 370, 368, 366, 362, 402, 443. While all the MSEs say that Plaintiff denied suicidal ideations, even a December 2016 record that states, "Pt claims that she had SI. … Pt went to the ER" says in the MSE section, "Pt denies any suicidal/homicidal intent plan or ideation." AR 713. This calls into question how much of the MSE language was part of a standard computerized form that Dr. Chu did not update at every appointment.

Dr. H. Taylor evaluated Plaintiff on September 4, 2015. AR 486-93. At around this same time, Dr. Chu assessed that Plaintiff was not doing well. AR 363-65. Therapist Benge assessed Plaintiff's depression as 7/10 and observed her crying before their session. AR 694. Ms. Benge noted, "She has been trying to find work, but doesn't seem well enough to do so." Id. Thus, Plaintiff's treating records seem more consistent with Dr. H. Taylor's opinions than inconsistent.

Ultimately, Dr. Chu assessing GAF scores of 40 and 50, consistent with seriously impaired function. Dr. Chu also apparently provided a letter to Dr. H. Taylor opinion that Plaintiff was too impaired to maintain employment. AR 486 (referencing letter). The ALJ, therefore, could not convincingly discount Dr. H. Taylor's opinions as overly restrictive compared to Dr. Chu's treating records.

### 3. Paragraph B Analysis.

In the ALJ's paragraph B analysis, the ALJ found that Plaintiff had only "moderate" limitations in the four relevant functional areas: (1) understanding, remembering, and applying information, (2) interacting with others, (3) maintaining concentration, persistence, or pace, and (4) self-management. AR

19-20.  Regarding social interactions, the ALJ reasoned that Plaintiff's medical records showed no difficulty interacting with treating providers and that she had a boyfriend (citing AR 696), facts that showed "some ability to appropriately interact with others."  AR 19.

The Court interprets the ALJ as discounting Dr. H. Taylor's opinions as inconsistent with the medical evidence discussed in the paragraph B analysis and not merely for being inconsistent with the ALJ's interpretation of that evidence.  The ALJ, however, failed to show a specific and legitimate inconsistency.  The fact that Plaintiff could interact appropriately with medical providers and had a boyfriend does not support a finding that she had only moderate, as opposed to marked, difficulties maintaining social interactions when considered with the other evidence of record, such as loosing dozens of jobs, some due to personality conflicts (AR 393, 288 500, 545, 572, 583), serious conflict with her mother and roommates leading to evictions and homelessness (AR 282, 393, 652, 658, 660, 674, 685), and the dysfunctional nature of her relationship with Tyler (AR 695, 691, 687, 686, 674, 660, 651, 647.

## V.
## CONCLUSION

District courts have discretion to remand a case either for additional evidence and findings or to award benefits.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  Courts should only remand for an award of benefits where further administrative proceedings would serve no useful purpose.  Id.

Here, further administrative proceedings are required to determine whether Plaintiff was disabled for part or all of her claimed period of disability.  On remand, the ALJ should obtain the letter Dr. Chu sent to Dr. H. Taylor and reconsider Dr. Chu's treating records and the weight of the medical evidence in light of that letter.  The ALJ may also need to consider whether any additional RFC restrictions would adequately address Plaintiff's functional limitations and the

effect (if any) of substance abuse on Plaintiff's abilities.

For the reasons stated above, IT IS ORDERED that judgment shall be entered REVERSING the decision of the Commissioner and REMANDING for further administrative proceedings consistent with this opinion.

DATED: November 08, 2019

*Karen E. Scott*
KAREN E. SCOTT
United States Magistrate Judge